IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RACHEL S. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | No. 23-cv-1269 |
| *Commissioner of Social Security* | : | |

**MEMORANDUM OPINION**

**CRAIG M. STRAW**                                                                 **November 27, 2024**
**United States Magistrate Judge**

      Rachel S. seeks review of the Commissioner's decision denying her application for benefits under Title II of the Social Security Act ("Act").  R. 145-51, 4288-4310.  The parties consented to proceed before a Magistrate Judge.[1]  Doc. 4.[2]  For the following reasons, I grant Plaintiff's request for review, vacate the Commissioner's decision, and remand the case for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

      Plaintiff originally filed a disability insurance benefits ("DIB") application for child's insurance benefits[3] on September 11, 2018.  R. 17, 51, 145-51.  After the claim was denied at the administrative level, Plaintiff sought review before an Administrative Law Judge ("ALJ").  R.

---

[1] See Doc. 3; 28 U.S.C. § 636(c) & Fed. R. Civ. P. 73.
[2] Citations to documents for this case are to the docket entry number, and the CM/ECF pagination of the documents.
[3] Under the Act, the Social Security Administration ("SSA") will provide a payment of disabled child's benefits if the claimant is under the age of eighteen years old or is eighteen years old or older and has a disability that began before attaining age twenty-two.  See 20 C.F.R. § 404.350(a)(5).  Plaintiff's application is based on the income of her father, wage earner Frederick S., Jr.  R. 145; 20 C.F.R. § 404.350(a)(5).

93-99.  The ALJ held a hearing that Plaintiff did not attend because she was hospitalized at the time, but her mother testified.  R.17, 50-51, 55-72.  The ALJ issued a decision on January 17, 2020, finding Plaintiff was not disabled.  R. 35.  Plaintiff appealed the decision, which was denied, making the decision of the Commissioner final.  R. 1; 20 C.F.R. § 404.981.  Plaintiff then sought review in federal court.  See Stair v. Saul, Docket No. 21-cv-1097 (E.D. Pa.) ("E.D. Pa. Docket").  On January 3, 2022, the Court granted Defendant's uncontested motion to remand the case for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  E.D. Pa. Docket, Docs. 22, 23.

On remand, the Appeals Council vacated the final decision of the Commissioner and remanded the case to the ALJ to resolve several issues.  R. 4288, 4356-59.  The Appeals Council directed the ALJ to obtain missing documents from the Mitchell Clinic regarding claimant's psychiatric disease including depression, to further evaluate whether claimant had a medically determinable mental impairment at step two, and, if warranted, to make specific findings regarding the four functional areas.  R. 4358.  Additionally, the ALJ was to obtain evidence from a medical expert regarding the nature and severity of claimant's mental impairments and whether the claimant required additional limitations in pace, persistence, and/or absences from chronic fatigue.  Id.  The ALJ was also to consider the maximum residual functional capacity ("RFC") of the claimant and provide rationale with specific references to the record evidence of assessed limitations, and in doing so evaluate the persuasiveness of the medical source opinions and prior administrative medical findings.  Id.  If warranted by the expanded record, the ALJ was to elicit supplemental evidence from a vocational expert ("VE") to clarify the effects of the limitations on the claimant's occupational base and ask the VE to identify appropriate jobs in the national

2

economy.  Id.  Additionally, the ALJ had to resolve conflicts between the occupational evidence and the information in the Dictionary of Occupational Titles (DOT) and companion publication—the Selected Characteristics of Occupations.  Id.  Finally, the order provided that the ALJ would offer the claimant an opportunity for a new hearing and take any action to complete the administrative record and issue a new decision.  R. 4359.

After remand, a telephone hearing was held on December 19, 2022 because of the Covid Pandemic before Margaret M. Gabell.  R. 4288, 4310, 4323, 4325, 4449.  Plaintiff testified at this hearing.  R. 4323-25, 4327-47.  Attorney Judith A. Dexter represented Plaintiff.  R. 4288, 4325.  VE Mitchell Schmidt also testified at the hearing.  R. 4288, 4325, 4348-52.

The ALJ issued a new decision on January 18, 2023, denying benefits for the period from September 10, 2011[4] to September 10, 2015 (hereinafter "relevant disability period").  R. 4288-89, 4291, 4308-10.  Plaintiff's counsel then initiated this action in federal court.  Doc. 1. Plaintiff filed a Brief and Statement of Issues in Support of Request for Review, Defendant filed a Response to Plaintiff's Request for Review, and Plaintiff filed a Reply Brief.  Docs. 15, 20, 21.

## II.    LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Commissioner employs a five-step sequential process to determine if a claimant is disabled, evaluating:

1.    Whether the claimant is currently engaged in substantial gainful activity;

---

[4] Plaintiff amended her alleged disability onset date ("AOD") to September 10, 2011—the day before her eighteenth birthday.  R. 4377; 20 C.F.R. § 404.350(a)(5).

2.      If not, whether the claimant has a "severe impairment" that significantly limits their physical or mental ability to perform basic work activities;

3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings," <u>see</u> 20 C.F.R. pt. 404, subpt. P, app. 1), which results in a presumption of disability;

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the RFC to perform their past work; and

5.      If the claimant cannot perform their past work, whether there is other work in the national economy that the claimant can perform based on the claimant's age, education, and work experience.

<u>See</u> <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014); 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to establish that the claimant can perform other jobs in the local and national economies based on their age, education, work experience, and RFC.  <u>See</u> <u>Poulos v. Comm'r of Soc. Sec.</u>, 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  <u>See</u> 42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" and must be "'more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  <u>Zirnsak</u>, 777 F.3d at 610 (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)); <u>see also</u> <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019) (explaining substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938) (additional citations omitted)).

It is a deferential standard of review.  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing

Schaudeck, 181 F.3d at 431).

III.    **ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW**

Plaintiff was born on September 11, 1993, and had not attained age twenty-two as of

September 10, 2011—the AOD.  R. 229, 4291.  The ALJ found that she had not engaged in

substantial gainful employment since her AOD.  R. 4291.  Because of her age, Plaintiff had no

work history.  Id.  Before attaining age twenty-two, the ALJ found that Plaintiff had several

severe impairments including myofascial pain syndrome, fibromyalgia, chronic fatigue, asthma,

bipolar disorder, oppositional defiant disorder ("ODD") and disorders of the spine.  Id.; 20

C.F.R. § 404.1520(c).  The ALJ opined that Plaintiff's impairments, either singly or in

combination, did not meet or medically equal any of the applicable Listings.[5]  R. 4291; 20 C.F.R.

pt. 404, subpt. P, app. 1; see also 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  The ALJ

decided claimant's mental impairments did not satisfy the paragraph B criteria[6] because she did

not have at least two marked limitations or one extreme limitation.  R. 4291-92.  Specifically, the

ALJ found that Plaintiff had moderate limitations interacting with others and concentrating,

---

[5] The ALJ considered Listings 3.03 (related to asthma), 12.04 (depressive disorder, bipolar and related disorders), 12.08 (related to ODD), and 104.00 (disorders of the spine).  R. 4291; see 20 C.F.R. § pt. 404, subpt. P, app. 1.  The ALJ noted there are no specific Listings for fibromyalgia or chronic fatigue.  R. 4291.

[6] The four "paragraph B" criteria rate a claimant's functional limitations.  See 20 C.F.R. pt. 404, subpt. P, app. 1.  To satisfy the "paragraph B" criteria, the mental impairment must result in one extreme limitation or two marked limitations in the four areas of mental functioning.  Id. § 12.00(A)(2).  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  Id. § 12.00(F)(2)(e).  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.  Id. § 12.00(F)(2)(d).

persisting, and maintaining pace, but no limitations understanding, remembering, or applying information and adapting or managing herself.  R. 4292-93.

Considering the longitudinal record, including Plaintiff's symptoms and the medical and non-medical evidence, the ALJ opined that, prior to attaining age twenty-two, Plaintiff had the RFC to perform sedentary work, except she was limited to no kneeling, crawling, or climbing ladders, ropes or scaffolds, or exposure to unprotected heights.  R. 4293.  She had to avoid concentrated exposure to extreme temperatures and have no more than occasional exposure to dust, odors, wetness, gases, fumes, and poorly ventilated areas.  Id.  Plaintiff was also restricted to occasional interaction with coworkers and supervisors and no direct public interaction.  Id.

The ALJ determined that considering Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  R. 4309.  The VE testified these jobs included sedentary occupations such as addressor, document preparer, and table worker.  Id.; 20 C.F.R. § 404.1569, 404.1569(a).  Accordingly, the ALJ found that Plaintiff had not been under a disability, at any time prior to September 10, 2015—the date she attained age twenty-two.  R. 4309-10; 20 C.F.R. §§ 404.350(a)(5), 404.1520(g).

In her request for review, Plaintiff first asserts that the RFC is not supported by substantial evidence in the record.  Doc. 15, at 12-24.  She also argues the ALJ erred when evaluating the paragraph B criteria and the opinion evidence.  Id. at 24-37.  Additionally, Plaintiff claims the ALJ failed to specifically address the credibility of Plaintiff and Plaintiff's mother, Mary Ann S.  Id. at 37-39.  Finally, Plaintiff asserts that the hypothetical questions posed

to the VE did not contain all the limitations the record evidence supports and therefore the decision is not supported by substantial evidence.  Id. at 39-40.[7]

The Commissioner argues that substantial evidence supports the RFC assessment for sedentary work with additional physical and mental limitations, and the ALJ adequately considered Plaintiff's fatigue.  Doc. 20, at 5-15.  The Commissioner also contends that substantial evidence supports the findings regarding the paragraph B criteria and the opinion evidence.  Id. at 15-20.  Moreover, the ALJ considered Plaintiff's mother's opinion.  Id. at 20-21.  Lastly, the Commissioner argues the VE included all of Plaintiff's limitations in the RFC and provided a proper analysis.  Id. at 22.

## IV.    FACTUAL BACKGROUND

The focus of the application currently before the Court is the four-year time-period between September 10, 2011 to September 10, 2015 when Plaintiff was eighteen until she turned twenty-two years old.[8]  R. 51-53, 77, 146, 4308-10, 4326-27; Doc. 15, at 1-2; Doc. 20, at 1. Plaintiff was eighteen years old on the AOD, making her a "younger individual" under the Act. R. 79-80, 83, 4308; 20 C.F.R. § 404.156(c).

---

[7] Plaintiff also includes two sentences in her brief claiming that her neck pain and iron deficiency anemia should have been identified and considered when determining her RFC.  Doc. 15, at 10. Plaintiff further claims, again in two sentences, that the Listings of 12.04 (depression) and 14.02 (lupus) have been met.  Id.  These passing references, without further explanation, are insufficient to warrant relief.  See Davis v. Comm'r Soc. Sec., 849 F. App'x 354, 359 (3d Cir. 2021) (stating "'[a]n issue is waived unless a party raises it in its opening brief and for those purposes a passing reference to an issue will not suffice it to bring that issue before this court.'") (quoting Laborers' Int'l Union v. Foster Wheeling Energy Corp., 26 F.3d 375, 398 (3d Cir. 1994)); see also Stancavage v. Colvin, No. 14-cv-1215, 2015 WL 3466207, at *13 (M.D. Pa. June 1, 2015) (finding Plaintiff waived argument that ALJ erred in RFC determination when Plaintiff only made passing reference to argument in opening brief without support).
[8] Plaintiff is currently in pay status for a subsequent SSI application that found her disabled effective October 25, 2019.  R. 4288, 4358.

A. **General background and medical evidence before relevant disability period**[9]

Plaintiff's issues began as a child. Educational records indicate that Plaintiff had a Section 504 plan at school because of her major depressive disorder and severe fatigue and was often absent. R. 256-62, 2095-97, 4295. Despite these challenges, Plaintiff graduated high school in 2012 on time. R. 55-56, 214, 1094, 1113, 4308, 4327-28, 4339. As of October 2013, Plaintiff was taking online college classes. R. 1072.

Plaintiff grew up in a house where her father was an alcoholic, and she witnessed her father pass out and her parents yell at each other. R. 2606, 2886-87. Plaintiff has a history of depression and cutting. R. 2597-98. She started taking Prozac in January 2009 when she was in tenth grade, and her suicidal ideations went away, but her performance at school declined. R. 2887. Welda Donato-Duque, M.D., conducted a psychiatric evaluation of Plaintiff in March 2009 for continued symptoms of depression. R. 2886. She diagnosed Plaintiff with major depressive disorder, recurrent with psychotic features, and mother child conflicts. R. 2888. Plaintiff had a Global Assessment of Functioning ("GAF") score of 45.[10] Id. She increased Plaintiff's Prozac prescription. Id.

Plaintiff was admitted for inpatient treatment at Kids Peace acute partial hospitalization program ("PHP") in June 2009 after an almost week-long stay at Lehigh Valley Hospital. R. 2597. Plaintiff was involuntarily committed and exhibited suicidal ideations, anger outbursts, and depression during her commitment. Id. Records indicate she was taking Prozac but had

---

[9] While I primarily focus on the medical evidence during the relevant disability period at issue, I also discuss some of the facts and medical evidence before and after the relevant disability period for background purposes.

[10] A GAF score of 45 indicates serious symptoms. R. 4296.

recently switched to Lexapro and had been compliant with medications. Id. Her GAF score at that time was a 30.[11] R. 2598. Outpatient notes from July 2009 showed Plaintiff had attended some individual counseling for mental health issues but ended therapy because she elected to see another counselor. R. 2880. Progress notes from October 2009 showed that Plaintiff was still taking Prozac, her mood was calm, appearance was normal, and affect was appropriate. R. 2879. Records between December 2009 and February 2010 show medication was helping, and her mood was euthymic. R. 2877-78. In July 2010, Plaintiff was anxious and was having mood swings. R. 2875. She remained on Prozac and added Seroquel. Id. Notes from an August 2010 appointment indicate that Plaintiff was depressed, and she admitted to being bulimic. R. 2874. Plaintiff continued taking Prozac but replaced Topamax with Seroquel. Id. She stopped Topamax at the end of August. R. 2873. The notes from her next several appointments showed mental health exams within normal limits. R. 2870-72. Plaintiff reported that Zoloft was helping so the dosage was increased at a November 26, 2010 visit. R. 2870. No additional subsequent mental health treatment notes are part of the record. R. 4297.

After referrals from different orthopedists, rheumatologist Albert Abrams, M.D., saw Plaintiff as a new patient on January 14, 2011 for joint pain. R. 424, 4298. Plaintiff reported that her symptoms began three-to-four years before. R. 424. She presented with snapping hip, ankle, neck, and shoulder pain. R. 425. Plaintiff's exam showed normal joint range of motion, no synovitis, no warmth, or erythema in any of the joints with left hip pain, and a little bit of

---

[11] A score of 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly in appropriately, suicidal preoccupations) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." See https://www.webmd.com/mental-health/gaf-scale-facts (last visited November 20, 2024).

scoliosis on her spine.  Id.  An x-ray of the left hip and lumbosacral spine was normal.  Id.  Dr. Abrams opined her pain was "clinically stable" at the time, but noted she was not doing well.  Id. He planned to run blood tests to rule out lupus and rheumatoid disease.  Id.  Dr. Abrams put the patient on Mobic 15 g QD and ordered an MRI of SI joints and Plaintiff's left hip.  Id.  The MRI of Plaintiff's spine showed a few small disc bulges and disc protrusions in the lumbar spine but no marrow edema or neural foraminal stenosis.  R. 472.  At the end of the month, Dr. Abrams again found Plaintiff "clinically stable" and referred her for PT.  R. 731-32.

Nicole Chiappetta, D.O., another rheumatologist, examined Plaintiff on March 30, 2011 as a second opinion to assess Plaintiff's left hip, mid thoracic, and ankle pain.  R. 725-27.  Dr. Chiappetta did not see any evidence of an underlying autoimmune disease but believed Plaintiff had myofascial pain syndrome in her entire back.  R. 726.  The doctor noted a minor leg length discrepancy on exam and wondered if this was contributing to Plaintiff's hypertonic muscles throughout her back.  Id.  Dr. Chiappetta added a muscle relaxant to Plaintiff's treatment and recommended continuing Cymbalta at 60 mg a day.  Id.  She also suggested a sleep study, and PT including aquatic therapy if Plaintiff wanted.  Id.

Dr. Chiappetta's notes from a June 15, 2011 visit state that Plaintiff had started Naproxen at 500 mg two times a day and stopped Daypro because, even though it helped, it was not as effective as it was before.  R. 723.  She was also prescribed Nuvigil at 150 mg once a day for help with daytime somnolence.  Id.  The doctor suggested acupuncture therapy and continuing with PT.  Id.

Plaintiff had a follow up visit with orthopedic surgeon Robert Palumbo, M.D.,[12] on June 27, 2011.  R. 566-69.  The rheumatologic work up to that point had been inconclusive.  R. 566.  Plaintiff reported feeling better over the last several weeks, and said she was having less pain in her back and was able to do more activities.  Id.  Plaintiff planned to continue her exercise program and Dr. Palumbo said she could start weaning into all activities.  R. 569.  PT notes from June 27, 2011 reported that patient's overall status was improving and she "was able to run for 3+ miles and 6+ miles without having any increased pain."  R. 571.

## B.  Medical evidence during relevant disability period

Progress notes from Dr. Chiappetta, dated October 5, 2011, provided that Plaintiff had less overall fatigue since starting Nuvigil and the doctor discussed increasing the dosage to the max of 250 mg once a day.  R. 714-18.  Dr. Chiappetta also renewed Plaintiff's Cymbalta prescription.  R. 718.  Notes from a December 26, 2021 visit similarly showed Plaintiff was less fatigued since starting Nuvigil and was doing better since starting Lyrica.  R. 713.  Cymbalta was continued at the current dosage and chiropractic therapy was also prescribed.  Id.

Neurologist Jay Varrato, D.O., examined Plaintiff at an acute visit on February 17, 2012. R. 1113-16, 3487-91.  Plaintiff complained of mid thoracic pain and "has been preoccupied with

---

[12] Plaintiff initially saw Dr. Palumbo in July 2010 for a left foot and ankle evaluation.  R. 359. Before Plaintiff saw Dr. Palumbo, Plaintiff had been dancing six hours a week until April 2010 when she had to stop because of pain.  Id.  Dr. Palumbo found Plaintiff had full range of motion of her ankle and subtalar joint and hip.  R. 362.  Plaintiff, however, had some pain with palpation of the left foot, ankle, and hip so he ordered an MRI.  Id.  The MRI showed mild spurring posteriorly between the talus and calcaneus, with tiny fluid foci which could represent ganglions. R. 475.  Otherwise, the MRI was normal.  Id.  Plaintiff then participated in PT for her foot and ankle.  R. 317-41, 376, 378-79, 392, 400, 428, 436, 438, 545-46, 562-644.  She also continued to see Dr. Palumbo throughout 2010 for muscle and joint pain.  R. 348-59.  Dr. Palumbo eventually became "very concerned" about the multiple areas of pain and strongly recommended that Plaintiff see a rheumatologist.  R. 345, 349.

the pain and muscle pain for the last two years." R. 1113. Despite this, Dr. Varrato found her "neurologic examination [was] essentially normal including muscle bulk" and agreed Plaintiff suffered from myofascial pain. R. 1115. Plaintiff's bloodwork from the last two years for several different panels showed normal complete metabolic panel and rheumatoid factor, and her Epstein-Barr and Bordetella tests were negative. R. 1113. Dr. Varrato ordered bloodwork and an EMG and said if those were normal, he did not feel further neurologic workup was necessary. R. 1115-16. Dr. Varrato noted Plaintiff's psychiatric history and cutting behavior. R. 1113. Plaintiff reported to Dr. Varrato that based on a recent psychiatric evaluation she no longer had depression. Id.

At an April 5, 2012 visit, Plaintiff complained mainly of upper back pain and very hypertonic muscles in her back. R. 706. She reported doing "well" since taking a combination of Lyrica and sulfa. Id. Dr. Chiappetta noted she did bloodwork which was negative for any specific cause. Id.

The EMG and nerve conduction study conducted on May 1, 2012 was normal. R. 3504-06. June 14, 2012 neurology visit notes indicated that Plaintiff reported she was the same and taking both Lyrica 100 mg twice daily and Cymbalta 60 mg daily helped some. R. 1098. Plaintiff was concerned that MS was causing her chronic fatigue and even though Dr. Varrato did not feel Plaintiff had that diagnosis, he ordered an MRI. Id. The MRI found "no acute intracranial hemorrhage, mass or acute major vascular distribution infarction." R. 3503.

On July 2, 2012, Plaintiff visited Sarah Hilbert, PA-C, for a routine physical and for driver forms to be completed. R. 1094. Plaintiff noted some improvement with her muscle and joint pain since increasing her Lyrica dosage to 100 mg twice daily and that her fatigue had improved,

but Plaintiff said "it[']s still bad." Id. Ms. Hilbert discussed with Plaintiff and her mother for a second time trying to wean Plaintiff off some of the medications she was taking because they could affect the central nervous system and based on concern about Plaintiff being overmedicated. Id. Plaintiff advised Ms. Hilbert at that visit that "her fatigue is worse because she is in her home all day and not doing much." Id.

Plaintiff believed that she would be better if she could get away from her house and live on her own. Id. Plaintiff mentioned wanting to attend a dance program at a school in Pittsburgh. Id. Ms. Hilbert referred Plaintiff to a doctor that specialized in adolescent medicine for her chronic fatigue and fibromyalgia. R. 1097-98. Plaintiff was also instructed to decease her Cymbalta to 20 mg two caps at bedtime twice a month, consider decreasing Cymbalta to 30 mg one cap at bedtime, and to stop Flexeril at bedtime. R. 1098.

Plaintiff was doing well overall at her August 2, 2012 rheumatologist appointment but still had a hypertonic muscle of her upper back. R. 704. Dr. Chiappetta offered trigger point injections, however, Plaintiff declined them. Id. Dr. Chiappetta advised Plaintiff to continue Lyrica and cyclobenzaprine at 5 mg at night and increased Cymbalta to 60 mg a day (despite her PCP's request to decrease it) because Plaintiff noticed a definite improvement at that level. Id. Plaintiff was told she could also take Naprosyn 500 mg two times a day as needed. Id.

On September 10, 2012, Plaintiff returned to Dr. Chiappetta. R. 701. She had decreased Cymbalta at her PCP's request, but generally felt better on the higher dose of Cymbalta. Id. Dr. Chiappetta administered post upper back trigger point injections, which were tolerated well. R. 699.

Plaintiff's September 17, 2012 pediatric adolescent medicine examination notes from Sarah Stevens, M.D., state that Plaintiff opted not to schedule an echocardiogram because the appointment times did not fit her schedule. R. 3081. Additionally, Plaintiff never saw a pulmonologist for respiratory complaints as recommended because she never got the referral. Id. Plaintiff did not think seeing a therapist would help because she "has physical pain." Id. Dr. Stevens noted that Plaintiff continued to take "too much" Naprosyn, but felt it helped her pain. Id. Plaintiff was given a pulmonology referral and directed again to see Dr. Chiappetta. R. 3083.

Plaintiff returned to the ER on May 3, 2013 with chronic thoracic pain, after initially visiting the emergency department ("ED") in December 2012 for similar pain. R. 1084. The ED gave her Vicodin and prednisone, and she started feeling back to baseline. Id. A thoracic spine MRI conducted in May 2012 was normal. Id. Ms. Hilbert did not give additional prednisone to Plaintiff and expressed concern about steroid overuse and that overuse causing osteopenia. R. 1085-86. Ms. Hilbert prescribed Vicodin for pain and directed Plaintiff to do daily back stretches to alleviate spine pain. R. 1086. Plaintiff returned less than a week later with pain, and complained about not being able to sleep and that Vicodin was triggering her asthma. R. 1081. Ms. Hilbert ordered a bone scan and for Plaintiff to start Vitamin D and to switch to Vicoprofen. R. 1083.

Plaintiff saw Dr. Chiappetta on May 20, 2013. R. 693. Dr. Chiappetta found Plaintiff to be clinically stable at the time. Id. The MRI and bone scan of the thoracic spine were within normal limits. Id. She believed Plaintiff's pain was due to the hypertonicity of the thoracic region and a flare of fibromyalgia. Id. She directed Plaintiff to begin aquatic therapy and

14

continue Cymbalta 60 mg daily, Lyrica 100 mg twice a day, and cyclobenzaprine 10 mg at bedtime. Id. By August 26, 2013, Dr. Chiappetta gave Plaintiff trigger point injections in her upper back and increased her Lyrica to 200 mg at night and 100 mg in the morning, renewed Tramadol to take as needed, and prescribed a lidocaine cream for her back. R. 690.

October 2, 2013 notes from Ms. Hilbert reported that Plaintiff again complained of severe muscle pain and bone pain of hips and thighs. R. 1072. Plaintiff had been undergoing PT five days a week and her shoulder had limited range of motion. Id. Plaintiff took Flexeril before bed but made her feel "dopey" and if she is not asleep within an hour of taking it Plaintiff would become nauseous and vomit. Id. Ms. Hilbert told Plaintiff to try Robaxin 500 mg up to twice a day for muscle pain/tightness. R. 1074. Plaintiff said the suggested gluten free diet did not help. R. 1072.

Dr. Chiappetta examined Plaintiff on December 16, 2013 and found no significant changes in her symptoms or examination findings. R. 685. Dr. Chiappetta again administered trigger point injections in her upper back and told her to continue her medicine regimen of Cymbalta, Flexeril, and Tramadol and compete blood work. Id.

Plaintiff had a hematology appointment with William Scialla, M.D., on June 6, 2014 after Dr. Chiappetta referred her based on the results of Plaintiff's most recent blood work showing she was anemic. R. 3222, 3237. Dr. Scialla evaluated Plaintiff for iron deficiency and IV iron. R. 3222. Dr. Scialla gave Plaintiff a round of IV iron to improve her iron stores, her anemia, and her fatigue. R. 3224.

Dr. Daniel Spatz, M.D., recounted Plaintiff's June 11, 2014 visit with him. R. 1066. Dr. Spatz said Plaintiff was a "very complicated individual" who began using his practice for general

15

health maintenance.  Id.  Plaintiff had a history of fibromyalgia, vitamin D deficiency, asthma, allergies, and anemia.  Id.  Upon examination, Plaintiff appeared pale and fatigued secondary to her anemia.  Id.  Dr. Spatz informed Plaintiff that he would not prescribe her medications other doctors had already prescribed for her.  Id.  Dr. Spatz found Plaintiff had a significant trigger point in her left upper middle neck, gave her an injection, and told her to continue Naprosyn for neck pain.  R. 1066, 1069.  Additionally, Plaintiff reported that she was in severe discomfort and was undergoing PT.  R. 1066.

Plaintiff continued to see Dr. Chiapetta over the next several months on numerous occasions.  On August 4, 2014, Dr. Chiappetta reinstituted methylphenidate ER 10 mg once a day and planned to recheck her vitamin D levels.  R. 681.  Plaintiff was told to continue iron diffusions as needed.  Id.  On November 3, 2014, Dr. Chiappetta's notes show that Plaintiff's vitamin D level and respiratory levels were normal.  R. 677.  Dr. Chiappetta also ordered repeat x-rays of the cervical thoracic and lumbar spines.  Id.  At the December 8, 2014 visit, Dr. Chiapetta opined that most of Plaintiff's pain was musculoskeletal in etiology and prescribed her pain medication.  R. 673.  She believed Plaintiff would be better suited seeing a pain management doctor or a doctor in physiatry for further evaluation.  Id.  Dr. Chiappetta also renewed Plaintiff's medication and directed her to report back in six months.  Id.  Dr. Chiappetta's March 30, 2015 notes state that Plaintiff underwent trigger point injections for her upper back region without difficulty.  R. 668.  On June 11, 2015, Dr. Chiappetta saw Plaintiff again for her history of chronic pain syndrome and new symptoms suggesting systemic lupus erythematosus, but Dr. Chiapetta did not find anything upon examination.  R. 664.  She renewed Plaintiff's prescription for methylphenidate and Lyrica.  Id.

An August 16, 2015, visit showed the blood work from the last visit was negative for specific lupus antibodies, but the work up showed elevated inflammatory markers. R. 658. Dr. Chiappetta noted Plaintiff's significant improvement in her back and rib pain on low dose steroids. Id. Plaintiff was told to start sulfasalazine 500 mg once daily for two weeks, and then increase to one tablet twice daily, increase prednisone to 15 mg a day for one month, then decrease 5 mg every month, and increase tramadol to 50 mg one every eight hours as needed. R. 659.

Dr. Scialla commented in his April 2, 2015 notes that he hoped the decrease in menstruation because of prescribed oral contraceptives would improve Plaintiff's iron deficiency. R. 3230. He noted Plaintiff received IV iron in October 2014 into November 2014 and it was possible she was no longer anemic. Id. Dr. Scialla mentioned Plaintiff's chronic symptoms and believed that were more related to her fibromyalgia, chronic fatigue, and myofascial pain syndrome. Id.[13]

C. **Non-medical evidence**

During the relevant disability period, Plaintiff lived with both her parents and never lived independently. R. 4327. Plaintiff testified that prior to the relevant disability period she missed most of the 2010 to 2011 school year mainly because of chronic pain, chronic fatigue, and

---

[13] The ALJ then outlined in significant detail the medical records from September 10, 2015 forward, noting the evidence was not in the claimant's file because it was well beyond the relevant period, so I do not discuss in detail those records. R. 4303-08. Briefly, though, the records suggest that Plaintiff's condition deteriorated over the next several years. In 2019, Plaintiff applied for and was awarded supplemental disability benefits via a subsequent disability application. R. 51, 4288. The Commissioner admits as much in his brief stating, "Plaintiff's condition deteriorated after September 2015" however, the Commissioner submits "that evidence relates to a period other than the one adjudicated by the ALJ" in this proceeding. Doc. 20, at 1.

"cognitive" issues.  R. 4328, 4332.  Plaintiff's report card showed she missed approximately

forty-three and a half days of school for the school year from September 2010 to June 2011.  R.

266-68, 4332, 4346.  She was required to make up missed schoolwork but was given an extended

amount of time to complete the work.  R. 4343.  Plaintiff was an advanced student academically

and attended AP and honors classes over the summer participating in dual enrollment at the local

community college.  R. 4328.  Therefore, her graduation was not delayed at all.  Id.

     Plaintiff was able to feed herself, but she did not cook or clean.  R. 4329.  She was unable

to stand to wash dishes for more than a couple minutes or load and unload the washer.  R. 4334.

Plaintiff said at times during high school her mother helped her get in or out of the shower and

get dressed when the pain was so bad it was debilitating.  R. 4340.  At the time she testified in

2022, Plaintiff said her condition had become worse.  R. 4329.  She spent a year in the hospital

in 2019 "unconscious" and "wheelchair bound" and was trying to rehab.  Id.

     Plaintiff received her driver's license after she graduated, however, she no longer had it at

the time of the hearing.  R. 4330.  She volunteered at an animal shelter about four hours a week

if she felt well enough to go when she woke up.  R. 1094, 4334-35.  Plaintiff testified she would

not have been able to keep a regular schedule volunteering at the animal shelter because of her

pain and fatigue.  R. 4335.  Plaintiff had insomnia, and her sleep patterns were unreliable during

that time.  R. 4336.  Plaintiff described her pain as "really widespread" through her "entire

body," all [her] joints . . . [her] spine, like [her] mid thoracic spine was some of the worst."  R.

4338.  Plaintiff also described being dizzy, having vertigo, and was unsteady on her feet.  R.

4342-43.  She occasionally used a cane during the relevant disability period.  R. 4347.  Plaintiff

admitted she had left the hospital or appointments at times against medical advice or argued with

18

medical staff when she did not do what staff wanted her do.  R. 4344.  Plaintiff testified that

certain perfumes, fragrances, and cleaning supplies set off her breathing and asthma problems.

R. 4344-45.

Plaintiff was a competitive dancer for much of her life.  R. 359, 1113, 4294.  Plaintiff

stopped dancing at one time in 2010 "because of pain and medical stuff" but went back to

dancing later.  R. 4339.  Eventually, Plaintiff stopped dancing for good in 2012 when she

graduated high school because of the "chronic pain and the amount of pain [she] was in on a

consistent basis," but not for one specific injury or reason.  Id.

Plaintiff completed an Adult Function Report in September 2018.  R. 197-207.  It is

unclear what time period the report covers.  Id.  Nevertheless, at the time of completion, Plaintiff

claimed she was unsteady on her feet, was unable to get around unassisted, had lost her ability to

concentrate, and her vision was affected.  R. 197.  Additionally, she said the dexterity in her

hands was lacking, she dropped things, she had headaches, pain and numbness in her left side,

and chest pressure, and was limited in her ability to move around.  Id.  Plaintiff spent her days in

bed only getting up to use the bathroom and go to doctor appointments, and her parents brought

her meals, drinks, and medication.  R. 198, 200.  She did not prepare her own meals.  R. 199.

Plaintiff sometimes would watch a show or movie on her computer.  R. 198.  She reported being

unable to fully dress herself, bath herself, feed herself and could not reach her lower legs to

shave.  Id.  Plaintiff did not drive and shopped online.  R. 200.  She had a saving accounts and

access online to a checking account.  Id.  Plaintiff never spent time with others socially either in

person, on the phone, or on the computer and lost her ability to engage in social activities.  R.

201-02.  She also had "issues" with her mom and dad.  R. 202.  Plaintiff represented that she

could only walk with a cane a few feet and that her vision was a problem.  R. 202-03.  She handled stress and changes in routine "ok."  R. 203.  Plaintiff stated she gets angry and difficult "when I feel like a chore instead of a human."  R. 204.

Plaintiff also completed Supplemental Function Questionnaires concerning her fatigue and pain.  R. 205-07.  She said she always has some level of fatigue and with her pain and mobility issues she does not get out of bed much.  R. 205-06.  Plaintiff has pain in her back, neck, joints, bones, and muscles, which began in 2006-2007.  R. 206.  She said it radiates through her chest and abdomen and shoots down her left leg.  Id.  Plaintiff has pain all the time, but has relief with pain medication until it wears off.  Id.  She has been on various pain medications throughout the years but at the time had a fentanyl patch and took hydromorphone.  R. 207.  Plaintiff tried PT and acupuncture and visited chiropractors.  Id.

Plaintiff's mother, Maryann S., completed a Third-Party Function report on August 14, 2018.  R. 188-95.  Again, the exact time the report covers is not specified.  Id.  The report stated that Plaintiff lived with her mom in a house.  R. 188.  It reported that Plaintiff is in bed unless she is going to the bathroom or attending a doctor's appointment.  Id.  She eats meals in bed semi-reclined.  Id.  Plaintiff's mother stated that Plaintiff does not get restful sleep, she needs assistance getting dressed, and she washes Plaintiff's hair and her extremities while using a shower chair.  R. 189.  Plaintiff has some incontinence, however, most of the time can use the toilet herself.  Id.  Plaintiff does not prepare her own meals because of balance issues, does not do household chores, can shop online, and has a savings/checking account she can access online, but does not have any bills to pay.  R. 190-91.  As her caregiver, Plaintiff's mother reported that Plaintiff can become very oppositional at times and is no longer able to socialize with friends or

attend family functions.  R. 193.  She stated that Plaintiff does not do well "if challenged" but otherwise is "fine."  R. 194.  Plaintiff was prescribed a cane in 2016-17.  Id.

## V.    **DISCUSSION**

### A.    The ALJ's decision regarding Plaintiff's RFC is not supported by substantial evidence.

Plaintiff first argues that the ALJ's decision is not supported by substantial evidence because it does not accurately assess the record evidence as a whole.  Doc. 15, at 12.  Among other assertions, Plaintiff points out that the ALJ did not sufficiently discuss and consider Plaintiff's fatigue when she determined Plaintiff's RFC.  Id. at 20-24.

An RFC assessment is the most a claimant can do in a work setting despite the limitations caused by his or her impairments.  20 C.F.R. § 404.1545(a)(1).  The RFC is based on all the relevant and other evidence in the case record.  Id. § 404.1545(a)(3).  It is the ALJ's exclusive responsibility to determine the claimant's RFC.  20 C.F.R. § 404.1546(c).  An ALJ must include in the RFC any credibly established limitations the record supports.  Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007) (citations omitted).

The ALJ's RFC assessment must be "'accompanied by a clear and satisfactory explication of the basis on which it rests.'"  Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).  If potentially conflicting evidence exists in the record, an ALJ must "give some indication of the evidence which he [or she] rejects and his [or her] reasons for discounting such evidence."  Burnett v. Comm'r Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see Cruz v. Comm'r of Soc. Sec., 244 Fed. App'x 475, 479 (3d Cir. 2007) (citation omitted) (stating when record contains conflicting evidence ALJ must explain what evidence is accepted and what evidence is rejected

and reasons for determination).  In the absence of such evidence, the Court "'cannot tell if

significant probative evidence was not credited or simply ignored.'"  Burnett, 220 F.3d at 121

(quoting Cotter, 642 F.2d at 705).  Furthermore, an ALJ may not reject evidence for no reason or

the wrong reason.  See Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

     In this case, the ALJ found that Plaintiff had the RFC to perform sedentary work[14] with

certain additional restrictions and only occasional interaction with coworkers and supervisors

and no direct public interaction.  R. 4293.  In making that RFC determination, the ALJ said:

> [T]he undersigned finds that the claimant has the above [RFC],
> which is supported by the longitudinal evidence of record.  As
> detailed above, at the beginning of the period at issue, the claimant
> was attending dance classes and anticipating attending college in
> Pittsburgh where she intended to participate in a dance program.
> Her examinations routinely showed a normal gait and full range of
> motion.  Treatment notes also showed that she obtained a driver's
> license and was volunteering in an animal shelter.  In June 2011, the
> claimant reported that she was running up to 6 miles.  She had
> excessive absences from school, but was able to complete her
> requirements and graduate from high school on time.  She was
> enrolled in honors and advanced placement classes and attended
> some of her courses at a local community college.  Records showed
> that the claimant had persistent complaints of pain and immobility,
> but her examinations and objective diagnostic testing showed little
> support for her complaints.  At times she refused recommended
> treatment and referrals and the records indicate that at times she was
> noncompliant with medication.  Prior to September 2015, the overall
> record showed she was diagnosed with fibromyalgia, but that her

---

[14] Sedentary work is defined as work "involving lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers, and small tools."  Titles II &
XVI: Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2,
1983 WL 31251, SSR 83-10, at *5 (S.S.A. 1983).  While sitting is involved, some walking and
standing is often necessary for the job duties.  Id.  Sedentary jobs require walking and standing
occasionally but do not involve significant stooping, and if other sedentary criteria of the job are
met.  Id.  The word "'occasionally' means occurring from very little to up to one-third of the
time."  Id.  For sedentary work, periods of walking or standing should generally not total more
than two hours out of an eight-hour workday and sitting is approximately six hours of an eight-
hour workday.  Id.

symptoms improved with treatment compliance and that she was engage[d] in a broad range of normal activities. Giving the claimant all benefit of the doubt, the undersigned finds that between the amended alleged onset date of September 10, 2011 and September 10, 2015 when the claimant attained age 22, the claimant was limited to sedentary work with additional postural and environmental limitations as well as restrictions on interacting with the public, coworkers and supervisors. However, these limitations do not preclude all work.

R. 4308.

The Court finds that Plaintiff's RFC is not supported by substantial evidence as set forth in the ALJ's current decision because the record contains conflicting evidence the ALJ has not resolved. This evidence includes Plaintiff's ability to perform certain activities such as running, competitive dance, regularly volunteering, driving, and attending school.

In support of the RFC, the ALJ notes that on June 27, 2011 Plaintiff reported to an orthopedic surgeon that her back pain improved with exercise and that she could run for over three miles and up to six miles without pain in support of the RFC. R. 571, 4308. While this fact may be informative as background, the June 27, 2011 date is outside the relevant four-year disability period. R. 77, 145-51, 4288, 4310, 4326-27. Therefore, the ALJ cannot use Plaintiff's ability to run without pain at that time as support for the RFC. Compare Plummer, 186 F.3d at 429 (stating ALJ cannot reject evidence for wrong reason). In fact, on the contrary, the record shows that during the relevant disability period "things got so bad and debilitating that [Plaintiff] couldn't do anything independently," like get in the shower or get dressed. R. 4340. This discrepancy needs to be addressed.

The ALJ gives numerous other reasons to support Plaintiff's RFC that are not consistent with the record as a whole without explaining the conflicting evidence. For instance, the ALJ

23

states that Plaintiff was taking dance classes and anticipated attending college in Pittsburgh at the beginning of the disability period at issue. R. 4308. Importantly, however, the record indicates Plaintiff quit dancing for good a year into the disability period in 2012 because of her chronic pain. R. 4339. The ALJ does not address this conflict. Additionally, to justify the RFC the ALJ relied in part on the fact that Plaintiff anticipated attending school in Pittsburgh, not that Plaintiff was *actually attending* school in Pittsburgh. R. 1094. This type of evidence suggesting she may have wanted to attend college in Pittsburgh does not lend support in favor of Plaintiff's RFC. See, e.g., Chambers v. Kijakazi, 635 F. Supp. 3d 339, 351 (D.N.J. 2022) (citations omitted) (stating claimant's desire to engage in volunteer work does not indicate she is capable of full-time work).

The ALJ also points out that Plaintiff was volunteering at an animal shelter in support of Plaintiff's RFC. R. 4308. Again, the record indicates this fact needs context. Plaintiff testified that, for some time during the four years, she sporadically volunteered at an animal shelter four hours a week when she felt up to it. R. 4333-34. Plaintiff had no set schedule ahead of time and would only volunteer when she felt okay on her own terms. Id. Volunteering at an animal shelter where Plaintiff could interact with the animals as she felt up to it is not indicative that Plaintiff was capable of working, even the least demanding, full-time, sedentary job that ALJ found her capable of performing. Id.; Fargnoli v. Massanari, 247 F.3d 34, 40 n.5 (3d Cir. 2001) (noting claimant's trip to Europe cannot demonstrate ability to perform light work when Plaintiff's testimony and treating physician's restriction show claimant cannot do the work and because "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"); Barats v. Weinberger, 383 F. Supp. 276, 284 (E.D. Pa. 1974)

(concluding "capability to perform intermittent, sporadic or infrequent activity does not constitute ability to engage in substantial gainful activity. . . .").

The ALJ also cites that Plaintiff obtained a driver's license to support the assessed RFC. R. 4308. While Plaintiff testified that she received a driver's license, she also stated for some time she did not drive at all because of safety concerns, and her mom or dad took her to appointments. R. 4333. She said, "[i]t was always a day-to-day thing. Some days I would feel okay. Others day I am like there is no way I can safely take myself. I need someone to take me." Id. Plaintiff later let her license lapse because she was "too disabled" to drive; she could not recall the date. R. 4330. Again, this type of sporadic activity, without further explanation from the ALJ, does not demonstrate Plaintiff's ability to engage in substantial gainful employment, even to perform sedentary job.

The ALJ made a broad and sweeping statement that the record showed, prior to September 2015, Plaintiff's treatment and symptoms improved and "she was engage[d] in a broad range of normal activities." R. 4308. This type of broad statement is problematic as it prevents the Court from being able to adequately and fully review the RFC. See Cotter, 642 F.2d at 704 (noting ALJ decision must include clear and satisfactory explication of basis on which it rests so Court can perform statutory function of judicial review). The Court cannot tell what those broad activities are for review purposes. Importantly, several places in the record at least raise questions regarding whether Plaintiff did or could have engaged in certain activities during the relevant disability period because of her limitations. R. 188-89, 194, 4328-29, 4331, 4334, 4339-40, 4347. Plaintiff argued she could not perform a broad range of activities because "every activity (school, volunteer work, family life) required accommodations and assistance." Doc. 15,

25

at 15.  The ALJ's failure to address this additional conflicting evidence is another basis to discount the RFC.  See Burnett, 220 F.3d at 121.

When addressing the RFC, the decision notes Plaintiff's challenges in school but limits the discussion to the fact that Plaintiff still took honors and advanced placement classes and graduated on time, despite her excessive absences.  R. 4308.  Importantly, the school district provided Plaintiff accommodations based on a Section 504 Plan during her high school years.  R. 256-62, 2095-97, 4295.  Plaintiff also had excessive absences during the 2010 to 2011 school year, Plaintiff's junior year, totaling forty-three and a half days excused and twenty-four and a half unexcused.  R. 266-68, 4332, 4346.

During most of Plaintiff's senior year, 2011 to 2012—during the relevant disability period—she continued to have a Section 504 Plan.  R. 264.  Plaintiff's disabilities were chronic fatigue and fibromyalgia, and the plan stated the fatigue "may cause her to miss consecutive days of school, as well as be late to school at times."  Id.  As accommodations, Plaintiff was allowed to make up late assignments and exams, was given a two-week extension to complete assignments and projects, could notify teachers of any consecutive days out, and her instructors had discretion to waive assignments, tests, or projects because of her disability.  Id.  Plaintiff also testified she also took frequent breaks.  R. 4332.  The record does not contain any detailed documentation or information about the number of days Plaintiff was absent during the 2011-2012 school year, although Plaintiff testified during her senior year she missed "more than I was allowed to per their sick day allotment."[15]  Id.

---

[15] During the hearing, Plaintiff's counsel posed a question to Plaintiff, suggesting she may have missed approximately forty-five days her *senior year* (2011-2012), and Plaintiff initially

The ALJ specifically questioned the VE about Plaintiff's absences and lateness at the hearing. R. 4349. After the VE found that even with Plaintiff's limitations she could perform the jobs of addresser, document preparer, and table worker existed in the national economy, the ALJ followed up with additional questions:

> Q: If I add to the hypothetical the individual would end up missing two to three days of work per month on a regular basis would that individual be able to maintain any work?
>
> A: No.
>
> Q: Instead of missing a full day of work, if they ended up leaving work early by about 60 minutes and if that were to happen the same consistency, two to three times per month would that individual be able to leave work early or come in late two or three times per month?
>
> A: No. Coming in late and leaving early is still time that would amount to not completing their full work day or being absent.

Id.

While it is unclear how often Plaintiff was absent during the 2011-2012 school year, during the prior 2010-2011 school year Plaintiff was absent almost one-third of the year. R. 266-68, 4332, 4346. Notably, Plaintiff had in place a similar Section 504 Plan with accommodations her senior year, and the plan specifically noted chronic fatigue and fibromyalgia may cause her to miss school or arrive late. R. 264-65. Furthermore, she testified at the hearing that she missed more days than she was allowed to miss her senior year. R. 4332. Since Plaintiff's absences

---

admitted that might be correct. R. 4332. As noted above though, the record indicates that Plaintiff was absent about forty-five days during the 2010-2011 school year, her junior year. R. 266-68, 4363. The Plaintiff later clarified that it was her junior year when she was absent forty-five times. R. 4346. The ALJ observed that together the excused and unexcused absences that year amounted to sixty-eight of approximately 180 days possible school days—about one third of the school year. Id.

resulting from her medical impairments may have affected her attendance and related absences

during the 2011-2012 school year, the ALJ should have solicited additional information from

Plaintiff and her counsel about the number of times she was absent that year before determining

Plaintiff's RFC.  See, e.g., Carmichael v. Barnhart, 104 F. App'x 803, 805 (3d Cir. 2004) (stating

"[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against

granting benefits" and finding ALJ fulfilled his duty developing record by ordering two

consultative examinations, obtaining records from previous medical providers, and two state

agency medical expert opinions) (citing Sims v. Apfel, 530 U.S. 103, 111 (2000)); Ventura v.

Shalala, 55 F.3d 900, 902 (3d Cir. 1995) (citations omitted) (emphasizing that ALJs have duty to

develop full and fair record in social security cases and "must secure relevant information"

regarding claimant's entitlement to benefits even if counsel represents claimant).

The omission could be important because if Plaintiff was, in fact, absent from the 2011-

12 school a similar number of times as the previous year, these absences, as referenced by the

VE, may have affected Plaintiff's ability to maintain substantial gainful employment and

rendered Plaintiff disabled.  See Gonzales v. Colvin, 191 F. Supp. 3d 401, 426 (M.D. Pa. 2015)

("finding of non-disability requires a finding that claimant can engage in work with regularity.");

Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, at *1

(S.S.A. July 2, 1996) (RFC is individual's ability to do work-related physical and mental

activities in work setting on regular and continuing basis, meaning 8 hours a day, for 5 days a

week, or equivalent schedule); see also Doc. 15, at 15, 17-20; Rutherford, 399 F.3d at 554 (RFC

must include all impairments).  For this reason, the ALJ's failure to elicit information from

Plaintiff about absences during this time frame was not harmless error, and is another basis for

remand.  See William Z. v. Kijakazi, No. 21-cv-3715, 2023 WL 334563, at *7-*8 (D.N.J. Jan. 20, 2023) (holding ALJ's failure to include up to one or two days of recovery time due to Plaintiff's seizures and failure to explain omission in RFC was harmful error and warranted remand).

On remand, the ALJ must address the contradictory evidence in the record and explain her reasons for rejecting certain evidence.  See Burnett, 220 F.3d at 121.  In addition, the ALJ must specifically address the effects of Plaintiff's fatigue and fibromyalgia on her ability to work and if the ALJ finds the evidence regarding fatigue is credible, the ALJ must pose new hypothetical questions to the VE.  See, e.g., Uncapher v. Colvin, No. 13-cv-886, 2014 WL 1316132, at *8 (W.D. Pa. Apr. 1, 2014) (remanding case to ALJ after she did not specify which of claimant's impairments were credible and stating on remand ALJ must specifically address how Plaintiff's fatigue affected ability to work); Pereira v. Colvin, No. 12-cv-6057, 2014 WL 7149371, at *4-5 (D.N.J. No. Dec. 12 2014) (noting "adjudicating a claim of fibromyalgia presents unique challenges [and] to conduct a meaningful review, the Court must be presented with a developed record").

Because contradictory evidence exists in the record that has not been resolved and certain evidence has not been discussed, I cannot say substantial evidence exists as the record currently

stands.[16]  Therefore, I remand the case to the ALJ for further consideration consistent with this

opinion.[17]

_____

[16] My decision is not meant to suggest that no evidence in the record supports a finding that Plaintiff was not disabled during the relevant disability period.  Nonetheless, as I explain, too many unexplained discrepancies exist to affirm the decision on this record.

[17] The Court will not address Plaintiff's remaining claims of error.  See, e.g., Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. 2016) (adopting magistrate judge's report and recommendation declining to address claimant's additional allegations of error because remand might produce different result, rendering discussion of those claims moot).  Related to the RFC issue, the ALJ also discusses the findings and persuasiveness of the medical opinions of Dr. Chiapetta, Dr. Suzan Streichenwein, M.D. (Social Security psychological expert), Dr. David Hutz, M.D. (state agency medical consultant), and Francis Murphy, Ph.D (state agency psychological consultant).  R. 4307-08.  Generally, they do not address or explain the contradictory evidence in the record or the limitations Plaintiff's fatigue causes.  R. 80-88, 2120-24, 4523-33.  Dr. Streichenwein touches on fatigue when she reported that Plaintiff had numerous absences, her persistent pain would interfere with work, and her fatigue is likely exacerbated by medication.  R. 4532.  But the ALJ found that opinion not persuasive since it was conclusory and did not address any mental functional limitations or Listings besides depression.  R. 4307.  Dr. Hutz discussed Plaintiff's physical limitations, which the ALJ adopts.  Id. at 4308.  Meanwhile, Dr. Murphy found insufficient evidence to permit a decision on the Paragraph B criteria.  R. 84.  Finally, Dr. Chiapetta's "opinion" was set forth on a serious health condition certification form she completed for Plaintiff's mother for the period of October 1, 2018 to January 1, 2019 (or longer)—outside the relevant disability period—and the ALJ for many reasons found it unsupported.  R. 2121-24.

**VI.**    <u>**CONCLUSION**</u>

For the reasons discussed above, Plaintiff's request for review (Doc. 15) is **GRANTED**.

The final decision of the Commissioner to deny Plaintiff benefits is **VACATED**, and the case is

**REMANDED** to the Commissioner for further consideration consistent with this opinion.

An appropriate order follows.


BY THE COURT:

<u>/s/ Craig M. Straw</u>
CRAIG M. STRAW
U.S. Magistrate Judge